IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KAREN MURPHY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 16 C 2366 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Karen Murphy ("Ms. Murphy" or "plaintiff") has filed a motion seeking reversal and remand of the partially favorable decision of the Commissioner of Social Security ("Commissioner") finding that Ms. Murphy was disabled and entitled to Social Security Disability Insurance Benefits ("DIB") as of April 13, 2007, but that her disability -- and thus her disability benefits -- ended on December 1, 2008 because medical improvement occurred (doc. # 7: Pl.'s Mot. for Summ. J. at 1). The Commissioner has filed a response asking the Court to affirm its decision (doc. # 19: Def.'s Resp.). For the reasons that follow, we deny Ms. Murphy's motion and affirm the Commissioner's decision to award benefits for a closed period from April 13, 2007 to December 1, 2008.

I.

Ms. Murphy originally filed her application for DIB on September 29, 2008, alleging she became disabled on April 13, 2007 (R. 753). In November 2010, an administrative law judge

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2]On June 22, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

("ALJ") recommended that Ms. Murphy's application be denied in its entirety (R. 13-28), and the Appeals Council adopted the recommendation and denied benefits (R. 1-8). After exhausting her administrative remedies, Ms. Murphy sought review in federal district court, which affirmed the ALJ's decision. However, the Seventh Circuit Court of Appeals reversed and remanded the case to the agency for further proceedings. *Murphy v. Colvin*, 759 F.3d 811 (7th Cir. 2014). Another ALJ held a hearing on June 10, 2015, and on November 4, 2015, the ALJ issued a partially favorable opinion, finding that Ms. Murphy was disabled from April 13, 2007 through November 30, 2008, but that her disability ended on December 1, 2008 (R. 748-65). The Appeals Council upheld the ALJ's determination, making it the final opinion of the Commissioner (R. 898-901). *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

On April 13, 2007, Ms. Murphy suffered an acute cerebrovascular accident (CVA or stroke); specifically, a left carotid artery dissection with left cerebral infarction (tear in arterial wall and obstruction of blood supply) (R. 434-36, 442).[3] Once discharged, Ms. Murphy received treatment from neurologist, Joseph H. Mayer, M.D., at Pronger Smith Medical Care ("Pronger"). For the remainder of 2007, Ms. Murphy presented with occasional right arm and hand numbness and pain, right hand loss of proprioception (sense of position and spatial orientation), mild aphasia (difficulty communicating), and headaches (*see, e.g.,* R. 306-12, 317-18, 321, 335, 338-40, 346, 529-31, 541, 549-51). During certain periods in 2007, she received physical therapy, speech therapy and occupational therapy for these symptoms (R. 543-45).

---

[3] "A stroke occurs when the blood supply to part of your brain is interrupted or severely reduced, depriving brain tissue of oxygen and nutrients." http://www.mayoclinic.org/diseases-conditions/stroke/home/ovc-20117264. "An aortic dissection is a serious condition in which the inner layer of the aorta, the large blood vessel branching off the heart, tears. Blood surges through the tear, causing the inner and middle layers of the aorta to separate (dissect)." http://www.mayoclinic.org/diseases-conditions/aortic-dissection/basics/definition/con-20032930 (last visited March 15, 2017).

2

Magnetic resonance angiography ("MRA") of the carotid vessels in March 2008 showed that the degree of stenosis (narrowing) in Ms. Murphy's left internal carotid artery had improved since an MRA in May 2007, but stenosis was still approximately 70 percent (R. 300, 358-59). In April 2008, Dr. Mayer reported that Ms. Murphy "still noted waxing and waning paresthesias [pins and needles sensations] over the right side of her body" and there was a moderate decrease in proprioception on the right side; at that time, her primary complaint was nightly headaches, which preceded her stroke (R. 300). Ms. Murphy's speech was generally fluent, but she had some mild word retrieval difficulty (*Id.*). She had good muscle strength and tone in all four extremities, rapid alternating finger movements were normal, and her gait and tandem gait were normal (*Id.*).

In July 2008, Dr. Mayer noted that Ms. Murphy's headaches were "clearly improved;" she did not use her prescription for gabapentin (nerve pain medication) and she occasionally took Fioricet (an analgesic) when over-the-counter medications did not help (R. 299). Ms. Murphy's speech was fluent, and her rapid alternating finger movements, gait, and tandem gait were normal (*Id.*). In September 2008, however, Ms. Murphy had right sided hand and foot pains, which caused her to drop things (R. 645). On October 31, 2008, Ms. Murphy reported to Dr. Mayer that her headaches were more frequent, and she was frustrated that the sensation in her right hand was "still quite bad" and she still had "some difficulty with speech" (R. 690). Ms. Murphy also demonstrated "severely diminished proprioception in the right hand" (*Id.*). Dr. Mayer rated the rest of her examination -- speech strength, rapid alternating finger movements, gait and tandem gait -- as normal, good or "fairly good, and he doubted that Ms. Murphy's headaches were related to her stroke (*Id.*). On December 15, 2008, Ms. Murphy had a follow-up MRA of her carotids, which showed approximately 60 percent stenosis of the high cervical left

internal carotid artery and recanalization (reopening) of the previous left internal carotid artery dissection (R. 584). The MRA showed no other stenosis (R. 585).

In the latter half of 2008, Ms. Murphy also complained to her physician about heel pain (R. 294). Imaging from September 2008 showed that she had moderate plantar fasciitis (inflammation of the tissue) on her left heel (R. 293). On October 31, 2008, Ms. Murphy visited podiatrist Steven French, DPM, who injected her left heel with a corticosteroid for inflammation and Lidocaine (anesthetic) for the pain (R. 651). Ms. Murphy was also treated with orthotics and a splint (*Id.*).

On January 24, 2009, Ms. Murphy went to the hospital with shortness of breath and chest tightness, and she was prescribed aspirin and discharged the next day (R. 672-74). Hospital records noted that Ms. Murphy "has improved significantly" from right hemiplegia (single side arm and hand weakness) and dysphasia (language impairment) resulting from stroke (R. 673-74). On March 3, 2009, Ms. Murphy followed up with a physician's assistant ("PA") at Pronger (R. 733). The PA noted that Ms. Murphy had a normal gait and 5/5 motor strength throughout, and that her status post CVA was "currently stable with no significant change" (*Id.*).

On October 14, 2009, Ms. Murphy visited her primary care physician at Pronger complaining of frequent headaches (R. 727). She also stated that she had sharp pains and paresthesias in her right side arms and feet, which had been "ongoing ever since" her stroke (R. 727-28). Nevertheless, she was "still able to do anything with the arm," and her neurologic exam was essentially normal (R. 728-29). On December 21, 2009, Ms. Murphy returned to Dr. Mayer for the first time since October 2008 (R. 722). She complained of numbness over the right side of her body, headaches, pain along the neck (muscular in nature), and forgetfulness (*Id.*). Dr. Mayer noted that Ms. Murphy's speech was "quite fluent," she had good strength in all four extremities,

her gait was stable and she showed no loss of balance (R. 722-23). However, rapid alternating finger movements were "slightly slower" and proprioception was "moderately diminished" in the right hand (*Id.*). Dr. Mayer noted that her last MRA showed Ms. Murphy "overall . . . has made a very good recovery" from her stroke, but "she remains very frustrated with her persistent deficits" (R. 723).

On July 23, 2010, Ms. Murphy and her husband appeared and testified before an ALJ (R. 1094). Ms. Murphy testified that she could only drive and stand for a short while before her foot or leg went numb, though her plantar fasciitis was "getting better" (R. 1101, 1131-33). At the time of the hearing, Ms. Murphy could do things like write and tie her shoes, and the ALJ observed she was "talking very well" that day (R. 1118, 1125). However, she still had occasional sharp pain in her right arm, and she had trouble distinguishing hot from cold (R. 1125-26). Ms. Murphy's husband testified that she still had problems trying to find the right word (R. 1136), and she was very forgetful (R. 1139-40). She also had trouble picking things up because she could not sense how much pressure she was using (R. 1159). Mr. Murphy stated that his wife's arm and leg pain kept her up at night so she had to lay down sometimes during the day (R. 1162).

### III.

As we explained above, the first ALJ who heard the case recommended an unfavorable decision, which the Appeals Council adopted, and a remand by the Seventh Circuit followed. After remand, a new ALJ held a hearing on June 10, 2015. At that hearing, Ms. Murphy testified there that she never "totally" got back to normal after her stroke (R. 784). It took her 12 to 18 months after her stroke to read and drive again (R. 785, 789). The parties stipulated to her husband's testimony from 2010 (R. 791).

5

A medical expert ("ME") in neurosurgery, Karl Manders, M.D., then testified by telephone. He opined that Ms. Murphy met Listing 12.02 for neurocognitive disorders, secondary to stroke, pain, right extremity weakness and speech difficulty "for a period of 18 months at least" from the date of her stroke (R. 793-95). Dr. Manders added that Ms. Murphy met Listing 12.02 "in the first year and a half, two years . . ." (R. 795). Dr. Manders also opined that Ms. Murphy met Listing 11.04A and B (for vascular insult to the brain) for "up to two years," because there was evidence of aphasia, ineffective speech, and persistent disorganization of motor function of her arm and leg (*Id.*).

Dr. Manders testified that the records from 2009 and beyond showed Ms. Murphy had "a very good neurological recovery" (R. 794), because she had full motor power, normal gait and essentially normal neurological examination, and her speech difficulty was "minimal" (R. 796). He opined that "by '09 . . . she had made pretty much full recovery except for some subjective complaints," and Ms. Murphy did not meet a listing "probably after two years" (R. 797). Upon further review of the October 31, 2008 medical report, Dr. Manders stated that Ms. Murphy would not meet a listing as of that date (R. 799-800). While proprioception difficulties would cause trouble with fine manipulation with her right hand, it would not "impact on her ability to function another way, grossly with manipulation," and Ms. Murphy would have no limits on her speech or her ability to stand, walk or sit (R. 800-04). Dr. Manders also stated that headaches or dizziness would not have impacted Ms. Murphy's functioning because her gait was normal and her cerebella testing was good (R. 803). He opined that her headaches were related to anxiety and stress, not to her stroke (R. 802-03).

In response to Ms. Murphy's attorney's questions about Dr. Mayer's December 21, 2009 medical report, Dr. Manders stated that the report showed that Ms. Murphy's proprioception had

6

improved, and she could probably do light activity by that time because proprioception does not have a lot of impact on most vocational activities (R. 805-06). However, the ME would limit Ms. Murphy to no heights or ladders because of the fear she could lose her balance even if her dizziness was only subjective or intermittent and slight (R. 807-08).

The ALJ next presented the vocational expert ("VE") with a hypothetical individual who could perform light work; frequently stoop, crouch, crawl, and kneel; occasionally balance and climb ramps and stairs but not climb ladders, ropes or scaffolding; frequently handle, finger and feel with the right dominant upper extremity (no limits on the left); and occasionally reach overhead bilaterally; with some additional non-physical limitations (R. 810-12). The VE stated that light, unskilled work would be available (R. 811-12). If the individual were limited to only occasionally feeling and fingering on the right dominant hand, there would be no light work available (R. 812). However, if the individual could frequently finger but only occasionally or never feel with the right hand, the number of jobs would not be impacted because fingering is more significant than feeling in the jobs (R. 812).

### IV.

On November 4, 2015, the ALJ issued a partially favorable decision (R. 748). The ALJ determined that Ms. Murphy was disabled from April 13, 2007, her alleged onset date, through November 30, 2008, but that on December 1, 2008, medical improvement occurred, and she became able to perform substantial gainful activity (R. 754).

To evaluate Ms. Murphy's impairments from April 13, 2007 through November 30, 2008, the ALJ applied the five-step sequential evaluation process. At Step 1, the ALJ found that Ms. Murphy had not engaged in substantial gainful activity since April 13, 2007 (R. 757). At Step 2, the ALJ found that from April 13, 2007 through November 30, 2008, Ms. Murphy had

7

the severe impairments of residual effects of CVA, including cognitive and communication difficulties (*Id.*). The ALJ stated that Ms. Murphy's depression was not severe because she stopped taking Zoloft to avoid weight gain and fatigue (*Id.*). The ALJ also found that Ms. Murphy's left foot plantar fasciitis was not severe, because although she received steroid injections and wore orthotics and a splint, her gait was normal and she had no deficits in range of motion or strength in her lower extremities (R. 758).

At Step 3, the ALJ determined that from April 13, 2007 through November 30, 2008, the severity of Ms. Murphy's impairments met Listing 12.02, and she was thus disabled during this time (R. 760). The ALJ stated that Ms. Murphy had demonstrated a loss of specific cognitive abilities with persistent memory impairment, and her impairment caused marked restriction in activities of daily living and marked difficulties in maintaining concentration, persistence or pace (*Id.*). The ALJ noted that Dr. Manders opined that Ms. Murphy's presentation at appointments with Dr. Mayer, coupled with her complaints of speech and language issues, demonstrated that these marked functional limitations lasted for 18 months from the onset of the CVA (*Id.*).

The ALJ then applied the eight-step sequential evaluation under 20 C.F.R. 404.1594 to determine if and when medical improvement occurred. At Step 1, the ALJ found that Ms. Murphy had still not engaged in substantial gainful activity, and at Step 2, the ALJ found that Ms. Murphy had not developed any new impairments as of December 1, 2008 (R. 760). At Step 3, however, the ALJ found that Ms. Murphy's impairments no longer met or equaled the severity of a Listing as of December 1, 2008 because medical improvement had occurred that ended Ms. Murphy's disability (*Id.*). The ALJ found that the criteria of Listing 12.02 were no longer met because Ms. Murphy no longer experienced more than moderate difficulties in social functioning and concentration, persistence or pace (R. 761). In addition, the ALJ noted that Dr. Manders

stated that Ms. Murphy did not meet Listing 11.04 because her speech had improved, her gait was normal and her strength was 5/5 in all extremities (R. 760).

In making her findings, the ALJ relied on Dr. Manders' determination that "the record establishes significant improvement [of plaintiff's condition] over time" (R. 759). The ALJ then reviewed parts of the record demonstrating such improvement. Within eight months of her CVA, Ms. Murphy was walking with a normal gait without support, and by April 2008, while there were some reports that sensation was impaired on the right side of her body, Dr. Mayer found Ms. Murphy was neurologically stable and the degree of stenosis in her left internal carotid artery had improved to approximately 70 percent (*Id.*). In addition, in April 2008, Ms. Murphy had good muscle strength and tone in all four extremities, normal gait and tandem gait, normal rapid alternating finger movements, and generally fluent speech (*Id.*). Her main complaint, frequent headaches, was unrelated to her CVA, and by July 2008, Dr. Mayer noted that Ms. Murphy's headaches had "clearly improved;" she did not take gabapentin and only occasionally took Fioricet when over-the-counter medication did not help her headaches (*Id.*).

The ALJ also reviewed a medical report in January 2009 that noted Ms. Murphy's speech and sensation issues had "significantly" improved, and at a primary care visit in March 2009, there was no mention of headaches (R. 761). By December 2009, Dr. Mayer stated that MRAs showed Ms. Murphy had made a "very good recovery" from her stroke despite her ongoing frustration with "persistent deficits" including right side numbness (R. 762). Her speech was fluent, she had good strength in all extremities, and proprioception was only moderately diminished in the right hand (*Id.*). The ALJ stated that Ms. Murphy's husband's testimony at the July 2010 hearing as to the extent of Ms. Murphy's headaches was not supported by Ms. Murphy's reports to her physicians or the treatment sought (*Id.*).

9

At Step 4, the ALJ found that the medical improvement that occurred was related to Ms. Murphy's ability to work (R. 762). At Step 5, the ALJ did not discuss whether an exception to medical improvement applies (*Id.*). At Step 6, the ALJ found that Ms. Murphy's status post-CVA was still a severe impairment, and the ALJ limited her to the following RFC at Step 7 beginning on December 1, 2008: light work; stand, walk or sit for about 6 hours of an 8 hour workday; frequently stoop, crouch, crawl and kneel; occasionally balance and climb ramps/stairs; never climb ladders, ropes or scaffolds; frequently handle, finger, and feel with the right dominant upper extremity with no limitations on the left; occasionally reach overhead bilaterally; avoid exposure to environmental and workplace hazards; and additional non-physical limitations (*Id.*).

For the period on and after December 1, 2008, the ALJ did not credit all of Ms. Murphy's statements regarding the intensity, persistence and limiting effects of her symptoms (R. 763). While Ms. Murphy claimed her headaches continued to be severe and disabling, the ALJ stated that the record showed that her headaches were less intense or easily treated with medication, since Ms. Murphy declined to take prescription gabapentin and only took Fioricet when Excedrin did not control her headaches (*Id.*). Regarding her post-CVA symptoms, the ALJ noted that Ms. Murphy had not had an MRA of the carotid arteries since December 2008 (*Id.*). Moreover, the ALJ noted a discrepancy between Ms. Murphy's assertion that she continued to have difficulty using her right side and her testimony that she did not remember what effects her right side difficulties had on her functional limitations in the time period following December 2008 (*Id.*).

At Step 8, ALJ determined that Ms. Murphy could perform her past relevant work as an office helper as generally performed -- unskilled and light (R. 763-64). Alternatively, the ALJ found that other jobs existed in the national economy that Ms. Murphy could perform (R. 764).

## V.

We review the ALJ's decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Plaintiff alleges three grounds for remand: (1) the ALJ erred in finding that Ms. Murphy did not meet a listing as of December 1, 2008 because that determination ignored the ME's testimony that Ms. Murphy no longer met a listing as of late 2009 or 2010; (2) the ALJ improperly discredited plaintiff's and her husband's testimony; and (3) the ALJ failed to consider plaintiff's foot problems in assessing her RFC (Pl.'s Mot. at 1; Pl.'s Mem. at 14-15). Contrary to plaintiff's arguments, we find that the ALJ's determination was supported by substantial evidence, and we affirm the decision.

## A.

Ms. Murphy contends that contrary to the December 1, 2008 date chosen by the ALJ, the ME found that she had experienced medical improvement and "ceased meeting a listing (11.04 and/or 12.02) no earlier than December 21, 2009, and possible in 2010" (doc. # 8: Pl.'s Mem. in Supp. of Summ. J. at 12). In her reply, Ms. Murphy clarified that the ME testified on direct examination both that she met a listing for 18 months after her stroke, and that she met a listing for 18 to 24 months, or "up to two years," after her stroke (doc. # 20: Pl.'s Reply at 2). Because

11

18 months after her stroke was in October 2008, and 24 months after her stroke was April 2009, Ms. Murphy contends that "no matter how the ME's testimony is characterized, it did not support the ALJ's finding that medical improvement took place December 1, 2008" (*Id.*).

A recipient of benefits may no longer be entitled to such benefits if:

> on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by . . . substantial evidence which demonstrates that . . . there has been any *medical improvement* in the individual's impairment or combination of impairments . . . , and the individual is now able to engage in substantial gainful activity.

42 U.S.C. § 423(f)(1) (emphasis added). The regulations define "medical improvement" as:

> any decrease in the medical severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] w[as] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s).

20 C.F.R. § 404.1594(b)(1).

The ALJ found that Ms. Murphy's impairments no longer met or equaled the severity of a Listing as of December 1, 2008 because she experienced medical improvement that ended her disability (R. 760). In making this determination, the ALJ relied on Dr. Manders' opinion, which the ALJ described as finding that Ms. Murphy's "presentation at appointments with Dr. Mayer, who noted some word retrieval issues, coupled with [her] complaints of speech and language issues[,] resulted in marked functional limitations in the two areas of functioning . . . for 18 months from the onset of the CVA" (*Id.*). At that point, the ALJ stated that Dr. Manders found Ms. Murphy no longer met a Listing because her condition had "significant[ly] improve[d] over time" (R. 759-60).

The ALJ did not find Ms. Murphy's statements to the contrary to be "entirely credible" (R. 763). The ALJ explained that while Ms. Murphy reported some aphasia and participated in speech therapy, her speech was generally fluent (R. 759-60). In addition, although Ms. Murphy reported numbness and sensation deficits on the right side of her body, her gait and rapid alternative finger movements were normal; her strength was 5/5 in all four extremities; she had not sought an MRA of her carotid arteries since December 2008 (at which time stenosis had improved and she was neurologically stable); and she began driving again by October 2008, 18 months after the CVA (R. 760, 763). And, while Ms. Murphy claimed her headaches were severe and disabling, the record showed that Ms. Murphy was usually able to control her headaches with nothing more than over-the-counter pain medication (R. 763). The ALJ further noted the January 2009 medical report stated that Ms. Murphy's speech and sensory issues had "significantly" improved (R. 761). And, the ALJ noted that during her hearing testimony, Ms. Murphy "repeatedly state[d]" that she did not actually remember the extent to which her functionality was impaired in 2008 and 2009 (R. 763). The ALJ was entitled to conclude that this made Ms. Murphy's reports of limitations during that time period unreliable.

We find that this constitutes substantial evidence in support of the ALJ's determination that plaintiff experienced medical improvement as of December 1, 2008. Recently, the Seventh Circuit upheld an ALJ's determination as to the date of a claimant's medical improvement based on similar evidence. In *Kleven v. Colvin*, No. 16-1183, 2017 WL 123131, at *2 (7th Cir. Jan. 11, 2017), the ALJ had concluded that the claimant had experienced medical improvement sufficient to perform substantial gainful activity by September 2011 based on treatment records and medical evidence leading up to that date, including an MRI from 2009 and X-rays performed in 2011, and that the claimant's allegations to the contrary were not credible. *Id.*

13

In this case, plaintiff's contention that the ME "admitted" that she did not experience medical improvement until late December 21, 2009 (Pl.'s Mem. at 11) misreads the record. As we explained above, and as plaintiff acknowledged in her reply, Dr. Manders opined that Ms. Murphy no longer met a Listing 18 to 24 months after her CVA. Contrary to plaintiff's argument, Dr. Manders' opinion does not limit the ALJ to choosing either October 13, 2008 (18 months post-CVA) or April 13, 2009 (24 months post-CVA) as the date that Ms. Murphy experienced medical improvement. Rather, the ALJ considered the date range provided in Dr. Manders' opinion, and based on the medical reports from 2008 and early 2009, determined that Ms. Murphy experienced medical improvement and no longer met a Listing as of December 1, 2008.

We doubt that any doctor (or ALJ) could state a precise date on which a stroke victim's recovery qualifies as medical improvement sufficient to permit work. But, the law requires that in determining medical improvement, an ALJ select a specific date. Here, we conclude that the ALJ reasonably, and with substantial evidence, selected December 1, 2008. We have no cause to find error in that determination. *See Startz v. Colvin*, No. 12 C 5240, 2014 WL 441953, at *9 (N.D. Ill. Feb. 4, 2014) (holding that there was substantial evidence in the record to support the ALJ's decision that the claimant experienced medical improvement by a specific date, such that he no longer met a Listing).

### B.

Ms. Murphy also argues that the ALJ improperly discredited her testimony and that of her husband (Pl.'s Mem. at 12). The ALJ found her husband's testimony that Ms. Murphy was still bedridden seven days a month due to headaches in 2010 was not supported by Ms. Murphy's reports to her physicians that her headaches had improved or by the treatment she had sought,

which was limited mostly to over-the-counter pain medication (R. 762). Plaintiff argues that "[t]hese reasons, none of which applied to Plaintiff's husband (all had to do with Plaintiff) were inadequate" (Pl.'s Mem. at 13). This argument is a non-starter. The Seventh Circuit has explained that, "[b]ecause the ALJ is in the best position to determine a witness's truthfulness and forthrightness, we will overturn an ALJ's credibility determination only if it is 'patently wrong.'" *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (citation and internal quotation marks omitted). In addition, "an ALJ is free to discount the applicant's [and in this case, her spouse's] testimony on the basis of the other evidence in the case as applicants for disability benefits have an incentive to exaggerate their symptoms." *Id.* (citation and internal quotation marks omitted). The ALJ's decision here to discount Mr. Murphy's testimony based on its inconsistency with the minimal treatment Ms. Murphy sought and her physician's minimal findings was not patently wrong.

Ms. Murphy contends that the ALJ's assessment of her credibility was inadequate because she "was not required to report the details of her headaches to her physicians," and the ALJ failed to ask why she did not take gabapentin for her headache pain before drawing an adverse inference (Pl.'s Mem. at 13-14). However, Ms. Murphy regularly reported on the status of her headaches to her physicians, and the ALJ properly relied on the absence of such reports as evidence that Ms. Murphy was not suffering from headaches. *See, e.g.*, *Slayton v. Colvin*, 629 F. App'x 764, 770 (7th Cir. 2015) (upholding ALJ's finding that claimant's allegations of pain were not fully credible where she failed to report certain symptoms to doctors and her reports of extreme pain were inconsistent). In addition, the ALJ did not err in drawing an adverse inference from Ms. Murphy's decision not to take gabapentin for her headaches because, as the ALJ pointed out, medical reports in the record explain the reason why Ms. Murphy did not take such

strong pain medication: her headaches were usually resolved with over-the-counter medications (R. 759-60).

## C.

Ms. Murphy also argues that the ALJ failed to consider plantar fasciitis and foot pain in formulating her RFC (Pl.'s Mem. at 14). The ALJ determined that Ms. Murphy's plantar fasciitis was not severe because her gait was normal and she had no deficits in range of motion or strength in her lower extremities (R. 758). Plaintiff contends that this reasoning was "illogical" because plantar fasciitis pain is worst upon waking and after long periods of standing or sitting (Pl.'s Mem. at 14-15). But, plaintiff's argument here -- that her gait and strength were normal during examinations because her pain was only at its worst during a few moments of the day -- supports the ALJ's determination that plantar fasciitis did not result in more than mild functional limitations (R. 758). Moreover, plaintiff does not point to evidence in the record that shows that plantar fasciitis caused her more functional limitations than those already accounted for in the RFC. Therefore, the ALJ's determination was not erroneous.

## CONCLUSION

For the reasons stated above, we deny Ms. Murphy's motion to remand (doc. # 7) and affirm the ALJ's decision (doc. # 19). The case is terminated.

ENTER:

Sidney I. Schenkier
**United States Magistrate Judge**

**Dated: March 22, 2017**